# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SHAR PRODUCTS COMPANY,
a Michigan corporation,

     Plaintiff,

v.

                                        Case No. 2:18-cv-11792
                                        Hon. George Caram Steeh

LANDMARK TECHNOLOGY, LLC,
a Delaware limited liability company,

     Defendant.

_____/

| | |
|---|---|
| BODMAN PLC | CHOKEN WELLING LLP |
| By:   Dennis J. Levasseur (P39778) | By:   David A. Welling |
|        Michael J. Serra (P77741) | 55 S. Miller Rd., Suite 203 |
| 1901 St. Antoine Street, 6th Floor | Akron, Ohio 44333 |
| Detroit, Michigan 48226 | (330) 865-4949 |
| (313) 393-7596 | davidw@choken-welling.com |
| dlevasseur@bodmanlaw.com | Attorney for Defendant |
| mserra@bodmanlaw.com | |

     -and-

BEJIN BIENEMAN PLC
By:   Charles A. Bieneman (P66755)
2000 Town Center, Suite 800
Southfield, Michigan 48075
(313) 528-4882
bieneman@b2iplaw.com
Attorneys for Plaintiff

_____/

## PLAINTIFF/COUNTER-DEFENDANT'S MOTION TO DISMISS
## COUNTERCLAIMS OF PATENT INFRINGEMENT

Plaintiff/Counter-Defendant Shar Products Company ("Shar"), by its undersigned attorneys, under Fed. R. Civ. P. 12(b)(6) and 35 U.S.C. § 101, moves to dismiss, with prejudice, Defendant/Counter-Plaintiff Landmark Technology, LLC's ("Landmark") Counterclaims.  Shar also moves for judgment in its favor that the patent at issue is invalid.  In support of this motion, Shar relies on the accompanying brief and exhibits.

Under E.D. Mich. LR 7.1, Shar's counsel sought Landmark's counsel's concurrence in the relief requested in this motion.  Concurrence was denied.

WHEREFORE, for the reasons stated more fully in the accompanying brief, Shar respectfully requests that this Honorable Court dismiss Landmark's Counterclaims with prejudice.

Dated: September 18, 2018                Respectfully submitted,

By: s/Charles A. Bieneman
        Dennis J. Levasseur (P39778)
        Michael J. Serra (P77741)
        BODMAN PLC
        1901 St. Antoine Street, 6th Floor
        Detroit, MI 48226
        (313) 393-7596
        dlevasseur@bodmanlaw.com
        mserra@bodmanlaw.com

        Charles A. Bieneman (P66755)
        BEJIN BIENEMAN PLC
        2000 Town Center, Suite 800
        Southfield, MI 48075
        (313) 528-4882
        bieneman@b2iplaw.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

SHAR PRODUCTS COMPANY,
a Michigan corporation,

      Plaintiff,

v.

                                    Case No. 2:18-cv-11792
                                    Hon. George Caram Steeh

LANDMARK TECHNOLOGY, LLC,
a Delaware limited liability company,

      Defendant.

_____/

| | |
|---|---|
| BODMAN PLC | CHOKEN WELLING LLP |
| By:   Dennis J. Levasseur (P39778) | By:   David A. Welling |
|        Michael J. Serra (P77741) | 55 S. Miller Rd., Suite 203 |
| 1901 St. Antoine Street, 6th Floor | Akron, Ohio 44333 |
| Detroit, Michigan 48226 | (330) 865-4949 |
| (313) 393-7596 | davidw@choken-welling.com |
| dlevasseur@bodmanlaw.com | Attorney for Defendant |
| mserra@bodmanlaw.com | |

      -and-

BEJIN BIENEMAN PLC
By:   Charles A. Bieneman (P66755)
2000 Town Center, Suite 800
Southfield, Michigan 48075
(313) 528-4882
bieneman@b2iplaw.com
Attorneys for Plaintiff

_____/

# BRIEF IN SUPPORT OF SHAR'S MOTION TO DISMISS LANDMARK'S COUNTERCLAIMS

## <u>ISSUE PRESENTED</u>

Whether Defendant/Counter-Plaintiff Landmark Technology, LLC's Counterclaims for patent infringement should be dismissed under Fed. R. Civ. P. 12(b)(6) because the asserted claims of its U.S. Patent No. 6,289,319 are invalid under 35 U.S.C. § 101 under controlling legal authority, including *Alice Corp. Pty. Ltd. v. CLS Bank Int'l.,* 573 U.S. ___, 134 S. Ct. 2347 (2014)?

Plaintiff / Counter-Defendant Shar Products Company answers: YES.

## CONTROLLING AUTHORITY

35 U.S.C. § 101

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l.,* 573 U.S. ___, 134 S. Ct. 2347 (2014)

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION....................................................................................1

II. THE '319 PATENT ...............................................................................3

    A. The '319 Patent Specification ....................................................3

    B. The '319 Patent Claims ..............................................................5

III. LEGAL STANDARDS............................................................................6

    A. Motions to Dismiss.....................................................................6

    B. Invalidity under 35 U.S.C. § 101................................................7

        1. The Two-Part *Alice/Mayo* Test .......................................7

        2. Legal and Factual Determinations of Patent-Eligibility ......9

IV. ARGUMENT .......................................................................................11

    A. The Claims Are Directed To An Abstract Idea Without An Innovation That Is Significantly More. ....................................12

    B. Landmark's Pleading Does Not Raise True Questions Of Fact.............17

        1. USPTO Findings Concerning Novelty And Non-Obviousness Are Irrelevant to § 101 Patent-Eligibility...........................17

        2. Even If Accepted As True, Landmark's Allegations Do Not Raise Any Genuine Factual Dispute. ................................18

        3. If Needed, This Court Can Accept Landmark's Claim Constructions For Purposes Of This Motion. ....................21

V. CONCLUSION ....................................................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l.,*
  573 U.S. ___, 134 S. Ct. 2347 (2014)........................................................ 1, 2, 7, 8

*Apple Inc. v. Motorola, Inc.,*
  757 F.3d 1286 (Fed. Cir. 2014)..........................................................................20

*Ashland, Inc. v. Oppenheimer & Co. Inc.*,
  648 F.3d 461 (6th Cir. 2011) ...............................................................................7

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.),*
  687 F.3d 1266 (Fed. Cir. 2012).........................................................................10

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..............................................................................................7

*Berkheimer v. HP Inc.,*
  881 F.3d 1360 (Fed. Cir. 2018)........................................................... 3, 9, 10, 11

*Bilski v. Kappos,*
  561 U.S. 593 (2010)........................................................................................ 7, 18

*Cleveland Clinic v. True Health Diagnostics,*
  859 F.3d 1352 (Fed. Cir. 2017)............................................................................9

*Content Extraction and Transmission, LLC v. Wells Fargo Bank,*
  776 F.3d 1343 (Fed. Cir. 2014)..........................................................................10

*Electric Power Group, LLC v. Alstom SA*
  830 F.3d 1350 (Fed. Cir. 2016)................................................................... 8, 9, 16

*FairWarning IP, LLC v. Iatric Systems, Inc.,*
  839 F.3d 1089 (Fed. Cir. 2016)............................................................................9

*Genetic Techs. Ltd. v. Merial L.L.C.,*
  818 F.3d 1369 (Fed. Cir. 2016)............................................................................9

*Intellectual Ventures I LLC v. Capital One Fin. Corp.,*
  850 F.3d 1332 (Fed. Cir. 2017)............................................................................9

*Interactive Gift Exp., Inc. v. Compuserve Inc.,*
  256 F.3d 1323 (Fed. Cir. 2001)..........................................................................19

*Internet Patents Corp. v. Active Network, Inc.,*
  790 F.3d 1343 (Fed. Cir. 2015).............................................................10

*Kaavo, Inc. v. Amazon.com, Inc.,*
  C.A. No. 14-353-LPS-CJB (D. Del. June 18, 2018) ...........................19

*Landmark Technology, LLC v. Assurant, Inc.,*
  Case No. 6:15-CV-76-RWS-JDL (E.D. Tex. July 14, 2015) .................2

*Mayo Collaborative Svcs. v. Prometheus Labs., Inc.,*
  132 S. Ct. 1289 (2012)............................................................................7

*Morgan v. Church's Fried Chicken,*
  829 F.2d 10 (6th Cir. 1987) .....................................................................7

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.,*
  811 F.3d 1314 (Fed. Cir. 2016)....................................... 2, 8, 9, 16, 19

*OIP Technologies, Inc. v. Amazon. com, Inc.,*
  788 F.3d 1359 (Fed. Cir. 2015)...................................................... 9, 10

*RecogniCorp, LLC. v. v. Nintendo Co., Ltd.,*
  855 F.3d 1322 (Fed. Cir. 2017)...............................................................9

*SAP America v. Investpic, LLC,*
  890 F.3d 1090 (Fed. Cir. 2018)...............................................................9

*Secure Mail Solutions LLC v. Universal Wilde, Inc.,*
  169 F. Supp. 3d 1041 (C.D. Cal. 2016), *aff'd.,* 873 F.3d 905 (Fed. Cir. 2017) ..11

*Tatcha, LLC v. Landmark Tech., Inc.,*
  Case No. 16-cv-04831-WHO (N.D. Cal. March 10, 2017).................2

*Teva Pharmaceuticals USA v. Sandoz, Inc.,*
  135 S. Ct. 831 (2015) .............................................................................21

*Two-Way Media v. Comcast Cable Comm.,*
  874 F.3d 1329 (Fed. Cir. 2017)............................................................18

*Ultramercial, Inc. v. Hulu, LLC,*
  772 F.3d 709 (Fed. Cir. 2014)..............................................................18

*Voter Verified, Inc. v. Election Systems & Software LLC,*
  887 F.3d 1376 (Fed. Cir. 2018)...............................................................9

*Williamson v. Citrix Online, LLC,*
  792 F.3d 1339 (Fed. Cir. 2015)............................................................21

**Statutes**

35 U.S.C. § 112 ................................................................................21

35 U.S.C. § 154 ..................................................................................3

35 U.S.C. § 101 ............................................................. 1, 7, 16, 25

35 U.S.C. § 112 ..................................................................................6

Leahy-Smith America Invents Act,
 PL 112-29, Sept. 16, 2011, 125 Stat 284, §§4(c) and 4(e) ....................................6

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................6

## I.  INTRODUCTION

The claims of U.S. 6,289,319 ("the '319 patent;" Exh. 1) cover nothing more than using generic technology to automate the abstract idea of providing inquiries and answers to process a transaction, and as such are unpatentable under 35 U.S.C. § 101[1] and *Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, 573 U.S. ___, 134 S. Ct. 2347 (2014).  This fundamental business process has been around for as long as merchants and customers have transacted business. We all have experienced the '319 patent's process because we have all interacted with a sales agent at a store or had credit approved.  For example, the system discussed in the '319 patent covers working with a loan officer to apply for a loan. Exh. 1, Abstr.

Tellingly, the '319 patent is entitled "Automatic Business and Financial Transaction Processing System." Its system for automated processing of loan applications and credit ratings*, id.,* Abstr., addresses the business problem of making screening loan applications more economical. *Id.,* 1:44-45.  Nonetheless, Landmark asserted the '319 patent here, as in many other cases since 2002, Exh. 2, against Shar's plain-vanilla e-commerce site.  Dkt. No. 9, Exh. G.  Landmark, then, clearly takes the broad view that the '319 patent encompasses the abstract idea of automating inquiries and answers to process a transaction.

---

[1] Courts routinely grant § 101 invalidity Rule 12 motions.  *See infra III.B.2.*

Landmark is presently party to seven lawsuits. Exh. 2. On information and belief, most if not all other cases have settled relatively shortly after being brought. One court recently denied without prejudice a motion for judgment on the pleadings alleging that the '319 patent is invalid under § 101. *Tatcha, LLC v. Landmark Tech., Inc.,* Case No. 16-cv-04831-WHO (N.D. Cal. March 10, 2017), attached as Exh. 3.[2]   Landmark submitted there the same expert declaration it submitted here. Dkt. No. 9, Exh. D. No doubt Landmark will contend that its expert raises questions of fact that cannot be resolved under Rule 12(b)(6). In reality, Landmark's allegations, including its expert's declaration, cannot support patent-eligibility even if accepted as true.  Here, the claims are not patent-eligible under § 101 because they simply do not recite a technical improvement. *See Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.,* 811 F.3d 1314, 1325 (Fed. Cir. 2016) (*citing Alice,* 134 S. Ct. at 2359). Improvements alleged in Landmark's pleadings are not shown in the patent and cannot raise a question of fact about a basis for § 101 invalidity. *See, e.g., Berkheimer v. HP Inc.,* 881 F.3d 1360, 1370

---

[2] Other parties have brought § 101 motions against Landmark.  The motion in *Landmark Technology, LLC v. Southern Motorcycle Supply, Inc.,* 17-CV-1836-JAH-JLB (S.D. Cal.), is currently taken under advisement.  A Magistrate Judge in *Landmark Technology, LLC v. Assurant, Inc.,* Case No. 6:15-CV-76-RWS-JDL (E.D. Tex. July 14, 2015), recommended a finding of § 101 invalidity for U.S. Patent No. 5,576,951, closely related to the '319 patent.  *See* Exh. 4.  *Tatcha and Assurant* each settled soon after motions were decided.  Unpublished opinions are attached to this brief as Exhibits 3, 4, and 5.

(Fed. Cir. 2018).

In short, the '319 patent claims and specification talk copiously about business improvements, but are fatally silent concerning any technical improvement. Landmark and its expert either draw legal conclusions that are the province of this Court, or make factual allegations that, even if true, do not show that the '319 patent, discloses a technical improvement either in its claims or specification. On its face – and even if factual allegations in Landmark's pleading are accepted as true – the '319 patent is a model of patent-ineligibility.

## II.    THE '319 PATENT

### A.    The '319 Patent Specification

The '319 patent[3] was motivated by "a high degree of sophistication" of existing technology that admittedly existed but had "not been put to use in the more complex types of goods and services distribution which requires a great deal of interaction between individuals and institutions." Exh. 1, 1:37-41. To address

---

[3] Issued on September 11, 2001, from an application filed November 30, 1994, which claimed priority to a 1984 patent application. Exh. 1. Claim 1 was amended to correct a typographical error, claims 2-6 were confirmed, and claims 7-28 were added, in an *Ex Parte* Reexamination Certificate dated June 17, 2007. *Id.* The '319 patent recently expired on September 11, 2018, seventeen years after its date of issue. 35 U.S.C. §§ 154(a)(2) and (c)(1). Had the '319 patent application been filed after June 8, 1995, its term would have been limited by twenty years from its earliest claim of priority, 35 U.S.C. § 154(a)(3), which was to an application filed May 24, 1984, *i.e.,* the '319 patent would have expired over fourteen years ago, on or around May 24, 2004.

this business wish list, the '319 patent identified four "objects of the invention:" to (1) "provide an economical means for screening loan applications," *i.e.,* save labor of loan officers; (2) "standardize the reporting and interpretation of credit ratings and their application to loan application processing;" (3) "reduce the amount of paperwork and processing time required by each loan application;" and (4) "offer a more personal way to apply for credit." *Id.,* 1:44-60. The '319 patent identified no "objects of the invention" other than these abstract business problems, and certainly never hints at solving any technical problem.

The '319 patent's abstract objects are achieved by implementing an old and fundamental process for considering a loan applicant:

> [A] system that ties together financial institution data processing, the computer services of a credit reporting bureau, and a plurality of remote terminals. Each remote terminal displays the live image of a fictitious loan officer who helps the applicant through an interactive series of questions and answers designed to solicit from the applicant all the information necessary to process his loan application. The terminal can acquire credit rating information about the applicant from the credit reporting bureau and make a decision based on all the information gathered about the credit worthiness of the applicant and the amount of loan to which he is entitled. The loan amount is then communicated to the applicant and to the financial institution for further processing of the loan.

*Id.,* 1:62-2:9.

To implement its abstract idea, the '319 patent provides "a general block diagram of the automatic loan processing terminal system." *Id.,* Fig. 1; 2:22-23.

Generic business elements are part of the system, including "a financial institution 1" and "a credit rating service 3." *Id.,* 2:24, 26.  Generic technology elements include "a central processor 4," "terminals 5," and "a communications control unit 6." *Id.,* 2:28, 31, 33.  Figure 2 provides details of the terminal 5, all of which are generic technology elements (as discussed below, Landmark may try to argue otherwise with respect to Figure 2's DMA or Direct Memory Access).

"[D]etailed flow diagrams of the system operation" in Figures 3-5, *id.,* 2:17-18, follow the generic functional descriptions of Figures 1 and 2. The descriptions of each of these diagrams do not include technical steps, but rather are functional descriptions of using generic technology for the abstract idea of processing a loan application. Figure 3 shows the "initial phase of the loan application process," which starts by activating the system so that "the recording of an image and sound of a fictitious loan officer is read from the videodisc 14 and appears on the video screen 18." *Id.,* 3:66-4:6. Figure 4 describes a process to fill out a loan application. *Id.,* 4:33-39.  Figure 5 describes a "subroutine used to receive a previous quotation from the financial institution," a sub-process for obtaining applicant information from a credit agency, and a sub-process for telling an applicant that a loan is approved and that funds can be obtained.  *Id.,* 4:61-63, 5:3-7, 5:36-42.

**B.      The '319 Patent Claims**

Independent claim 1, reproduced in its entirety in IV.A below, is about "[a]n

automatic data processing system for processing business and financial transactions between entities from remote sites." Exh. 1, 6:7-9. The claim is obfuscatingly long, but nonetheless easily boils down to implementing various generic technology components (such as "a central processor," "a terminal," and a "video screen) to carry out long-practiced transaction steps such as entering information relating to orders, storing order and inquiry data, submitting orders, and receiving order information for display. Claims 2-28 depend directly or indirectly from claim 1 and are also indisputably about this system because each dependent claim "shall be construed to incorporate by reference all the limitations of [claim 1 and any intervening claim] to which it refers." 35 U.S.C. § 112, ¶ 4.[4] Some claims recite "means for" performing various functions; these claims "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6.

## III.   LEGAL STANDARDS

### A.   Motions to Dismiss

A Rule 12(b)(6) motion must be granted where a plaintiff cannot allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*

---

[4] The '319 patent application was filed well before September 16, 2012; therefore, 35 U.S.C. § 112 prior to September 16, 2011, applies (the new statute is substantively the same, but implements paragraph lettering). *See* Leahy-Smith America Invents Act, PL 112-29, Sept. 16, 2011, 125 Stat 284, §§ 4(c) and 4(e).

*v. Twombly,* 550 U.S. 544, 570 (2007). The court must "construe the complaint in the light most favorable to the plaintiff," and "accept all well-pleaded factual allegations as true." *Ashland, Inc. v. Oppenheimer & Co. Inc.*, 648 F.3d 461, 467 (6th Cir. 2011). Yet, the court "need not accept as true legal conclusions or unwarranted factual inferences," or "legal conclusions masquerading as factual allegations." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). The court may also "consider other materials that are integral to the complaint, are public records, or are otherwise" judicially noticeable. *Ashland,* 648 F.3d at 467.

### B.   Invalidity under 35 U.S.C. § 101

#### 1.   The Two-Part *Alice/Mayo* Test

A United States patent is available for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  A two-part test governs patent validity under § 101: (1) "whether the [patent] claims at issue are directed to . . . patent-ineligible concepts," *i.e.,* "laws of nature, natural phenomena, or abstract ideas," and, if so, (2) whether claims recite an "element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice Corp.,* 134 S. Ct. at 2355 (*quoting Mayo Collaborative Svcs. v. Prometheus Labs., Inc.,* 132 S. Ct. 1289 (2012)); *see also Bilski v. Kappos,* 561 U.S. 593 (2010).  In *Alice,* "the claimed

method require[d] the use of a computer to create electronic records, track multiple transactions, and issue simultaneous instructions;" such use of a generic computer was not enough to recite a patent-eligible concept. *Alice,* 134 S. Ct. at 2359-60.

Two very relevant Federal Circuit cases applying the *Alice* test are *Mortgage Grader, supra,* and *Electric Power Group, LLC v. Alstom SA,* 830 F.3d 1350 (Fed. Cir. 2016). In *Mortgage Grader,* the Federal Circuit affirmed summary judgment of § 101 ineligibility of claims to "[a] computer-implemented system for enabling borrowers to anonymously shop for loan packages offered by a plurality of lenders." 811 F.3d at 1318. The Federal Circuit agreed with the trial court that the claims were "directed to the abstract idea of 'anonymous loan shopping.'" *Id.* at 1324. There was no significant additional innovation; the claims simply added generic computer components, and did not improve the functioning of a computer or other technology. *Id.* at 1324-25.

In *Electric Power Group,* the patents-in-suit disclosed and claimed "performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results." *Id.* at 1351. The Federal Circuit affirmed a grant of summary judgment under § 101 invalidity because

> [T]he claims do not go beyond requiring the collection, analysis, and display of available information in a particular field, stating those functions in general terms, without limiting them to technical means

8

for performing the functions that are arguably an advance over conventional computer and network technology.

*Id.* The claims were directed to an abstract idea because they focused "not on . . . an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Id.* at 1354. Further, the *Electric Power Group* claims did not include a significant additional innovation because they presented no concrete or particular solution, but rather sought a monopoly on "any way of effectively monitoring multiple sources on a power grid." *Id.* at 1356.

## 2.   Legal and Factual Determinations of Patent-Eligibility

Patent-eligibility is a question of law that "may contain underlying issues of fact." *Berkheimer v. HP Inc.,* 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citing *Intellectual Ventures I LLC v. Capital One Fin. Corp.,* 850 F.3d 1332, 1338 (Fed. Cir. 2017); *Mortgage Grader,* 811 F.3d at 1325. However, many § 101 cases do not include genuine factual disputes and can be "resolved on motions to dismiss or summary judgment." *Berkheimer,* 881 F.3d. at 1368.[5] Moreover, § 101 questions

---

[5] Courts routinely dispose of patents on § 101 grounds at the pleadings stage. *See, e.g., SAP America v. Investpic, LLC,* 890 F.3d 1090 (Fed. Cir. 2018) (Rule 12(c)); *Voter Verified, Inc. v. Election Systems & Software LLC,* 887 F.3d 1376 (Fed. Cir. 2018) (Rule 12(b)(6)); *Cleveland Clinic v. True Health Diagnostics,* 859 F.3d 1352 (Fed. Cir. 2017) (Rule 12(b)(6)); *RecogniCorp, LLC. v. v. Nintendo Co., Ltd.,* 855 F.3d 1322 (Fed. Cir. 2017) (Rule 12(c)); *FairWarning IP, LLC v. Iatric Systems, Inc.,* 839 F.3d 1089, 1098 (Fed. Cir. 2016) (Rule 12(b)(6)); *Genetic Techs. Ltd. v. Merial L.L.C.,* 818 F.3d 1369 (Fed. Cir. 2016) (motion to dismiss); *OIP Technologies, Inc. v. Amazon. com, Inc.,* 788 F.3d 1359 (Fed. Cir. 2015) (Rule

should be disposed of as early as possible.  As Federal Circuit Judge Mayer has explained:

> Addressing 35 U.S.C. §101 at the outset not only conserves scarce judicial resources and spares litigants the staggering costs associated with discovery and protracted claim construction litigation, **it also works to stem the tide of vexatious suits brought by the owners of vague and overbroad business method patents.** Accordingly, where, as here, asserted claims are plainly directed to a patent ineligible abstract idea, we have repeatedly sanctioned a district court's decision to dispose of them on the pleadings. I commend the district court's adherence to the Supreme Court's instruction that patent eligibility is a "threshold" issue, [*Bilski*], by resolving it at the first opportunity.

*OIP Technologies, Inc.,* 788 F.3d at 1364-65 (Mayer, J., concurring) (emphasis added; citations omitted).

Explaining where patent-eligibility does and does not present fact questions, the *Berkheimer* court affirmed that claims 1-3 of the patent-in-suit were properly held ineligible on summary judgment.  *Id.* at 1370.  But Berkheimer's claims 4-7 raised a factual question warranting remand because, in contrast to claims 1-3, claims 4-7 recited structures for which the specification identified possible

---

12(c)); *Internet Patents Corp. v. Active Network, Inc.,* 790 F.3d 1343 (Fed. Cir. 2015) (Rule 12(b)(6)); *Content Extraction and Transmission, LLC v. Wells Fargo Bank,* 776 F.3d 1343 (Fed. Cir. 2014) (Rule 12(b)(6)).  As the above cases demonstrate, a court need not construe the patent claims before making a § 101 determination.  *See also Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.),* 687 F.3d 1266, 1273 (Fed. Cir. 2012).

technical benefits related to the technical feature of "linked object structures:"

> Claim 4 recites "storing a reconciled object structure in the archive without substantial redundancy." **The specification states** that storing object structures in the archive without substantial redundancy improves system operating efficiency and reduces storage costs. **It also states** that known asset management systems did not archive documents in this manner. Claim 5 depends on claim 4 and further recites "selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items." **The specification states** one-to-many editing substantially reduces effort needed to update files because a single edit can update every document in the archive linked to that object structure. . . . **According to the specification,** conventional digital asset management systems cannot perform one-to-many editing because they store documents with numerous instances of redundant elements, rather than eliminate redundancies through the storage of linked object structures.

*Id.* (emphases added; citations omitted).  In contrast, a specification that "lack[s] specificity in describing the supposedly inventive concepts" cannot support patent-eligibility.  *Secure Mail Solutions LLC v. Universal Wilde, Inc.,* 169 F. Supp. 3d 1041, 1053 (C.D. Cal. 2016), *aff'd.,* 873 F.3d 905 (Fed. Cir. 2017).

## IV.   ARGUMENT

Under part one of the § 101 test, the '319 patent claims are directed to the unpatentable abstract idea of automating inquiries and answers to process a transaction.  Under part two, the claims do not recite any additional significant innovation; the claimed abstract idea simply uses generic computing technology.

### A.      The Claims Are Directed To An Abstract Idea Without An Innovation That Is Significantly More.

The chart below considers each of the elements of claim 1 of the '319 patent to explain how the claim on its face, though lengthy, encompasses a patent-ineligible abstract idea without a significant additional innovation to overcome the abstract idea.  In short, the chart shows that each element of the claim either recites an abstract idea, or applies generic technology to an abstract idea.  Even when considered as a whole, the elements of claim 1 merely add up to combining generic technology with abstract ideas.  As such, claim 1 is patent-ineligible.

| Claim 1 | Patent-Eligibility Analysis |
| --- | --- |
| *An automatic data processing system for processing business and financial transactions between entities from remote sites which comprises:* | Abstract idea of handling inquiries and orders with remote customers, such as processing a loan application. |
| *a central processor programmed and connected to process a variety of inquiries and orders transmitted from said remote sites;* | Repeats the abstract idea, implemented with generic computing technology. |
| *said central processor including:* | Generic computing technology "used primarily to process loan applications and handle other financial transactions." Includes a communication interface and is associated with a communication control unit (6); has a |
| *means for receiving information about said transactions from said remote sites;* | |
| *means for retrievably storing said information;* | |
| *at least one terminal at each of said remote sites including a data processor and operational sequencing lists of program* | |

| Claim 1 | Patent-Eligibility Analysis |
|---|---|
| *instructions;* | terminal monitor and update unit (7) and a memory 8.   Exh. 1, 2:27-38, 46-49.  These are all simply generic functional blocks. |
| *means for remotely linking said terminal to said central processor and for transmitting data back and forth between said central processor and said terminal;* | |
| *said terminal further comprising means for dispensing information and services for at least one of said entities including:* | |
| *a video screen;* | Generic hardware. |
| *means for holding operational data including programing, informing, and inquiring sequences of data;* | Generic computer memory; the terminal 4 RAM memory 17 is described as holding and providing loan and financial data, and operating routines.  Exh. 1, 2:40-44; 3:23-26; 4:44-49; 4:66-5:1. |
| *means for manually entering information;* | Generic input device (touchpad or keyboard). Exh. 1, 3:54-56. |
| *means for storing information, inquiries and orders for said transactions entered by one of said entities via said means for manually entering information, and data received through and from said central processor;* | See above re "means for holding operational data." |
| *on-line means for transmitting said information, inquiries, and* | Generic technology such as modems and |

| Claim 1 | Patent-Eligibility Analysis |
|---|---|
| *orders to said central processor;* | telephone lines. Exh. 1, 2:24-27. |
| *on-line means for receiving data comprising operator-selected information and orders from said central processor via said linking means;* | The '319 patent discloses simply that its generic technology implements the functionality of an applicant selecting a loan type based on loan information sent to the terminal. Exh. 1, 3:6-15. |
| *means for outputting said informing and inquiring sequences on said video screen in accordance with preset routines and in response to data entered through said means for entering information;* | This is simply the concept of putting instructions and questions on a video screen; *i.e.,* generic computing technology used to implement the abstract idea of handling inquiries and orders with remote customers. |
| *means for controlling said means for storing, means for outputting, and means for transmitting, including means for fetching additional inquiring sequences in response to a plurality of said data entered through said means for entering and in response to information received from said central processor;* | This is simply the concept of asking follow-up questions, *i.e.,* generic computing technology used to implement the abstract idea of handling inquiries and orders with remote customers. |
| *said informing sequences including directions for operating said terminal, and for presenting interrelated segments of said operational data describing a* | See above re "means for outputting said informing and inquiring sequences;" this just |

| Claim 1 | Patent-Eligibility Analysis |
|---|---|
| *plurality of transaction operations;* | adds the abstract concept of asking related questions in sequence. |
| *said programming sequences including means for interactively controlling the operation of said video screen, data receiving and transmitting means; and for selectively retrieving said data from said means for storing;* | Abstract functionality of storing, transmitting, and displaying data; the '319 patent discloses no "programming sequences." |
| *said means for storing comprising means for retaining said operational sequencing list and means responsive to the status of the various means for controlling their operation;* | See above re "means for storing." |
| *said central processor further including:* | |
| *means responsive to data received from one of said terminals for immediately transmitting selected stored information to said terminal; and* | See above re central processor. |
| *means responsive to an order received from a terminal for updating data in said means for storing;* | |
| *whereby said system can be used by said entities, each using one of said terminals to exchange information, and to respond to inquiries and orders instantaneously and over a period of time.* | Restatement of the abstract idea. |

In evaluating similar claims in *Mortgage Grader,* the Federal Circuit found no patent-ineligible inventive concept because "the claims 'add' [to the abstract idea of shopping for loan packages] only generic computer components such as an 'interface,' 'network,' and 'database.'" 811 F.3d 1324. Moreover, the Federal Circuit approved that, "in making its patent-eligibility determination, the district court looked only to the claims and specifications of the patents-in-suit." *Id.* at 1325. Here, the claims on their face are easily distilled to generic technology and abstract ideas. Moreover, there is nothing in the '319 patent specification that even hints at a patent-eligible technical innovation. The Court should find the '319 patent claims invalid under § 101 as in *Mortgage Grader.*

The claims here are also like the claims in *Electric Power Group.* There, claims directed to monitoring an electric power grid were focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis," 830 F.3d at 1353, amounting to no more than a patent-ineligible "combination of those abstract-idea processes." *Id.* at 1354. As in *Electric Power Group,* the '319 patent attempts (as witnessed by Landmark's assertion of the patent against ubiquitous e-commerce functionality) to monopolize all ways of automating inquiries and answers to process a transaction. The '319 patent claims therefore fail under § 101 just like the *Electric Power Group* claims.

The dependent claims do not add more to the abstract idea than is in claim 1.

Claim 2 simply recites the abstract concept of evaluating a person's qualifications for a transaction, *e.g.,* a credit report.  Claims 3-10, 12, 18-21, and 25-28 simply call out generic technical concepts as part of the claimed system.  Claims 11, 13-17, and 22-24 simply call out longstanding business practices, like purchasing stocks and securities (claim 14) or filing a tax return (claim 15).  Therefore, the dependent claims do not add a significant additional inventive concept to the patent-ineligible abstract idea of claim 1, and are likewise patent-ineligible.

### B.  Landmark's Pleading Does Not Raise True Questions Of Fact.

Even when the facts are viewed in a light most favorable to Landmark, the '319 patent unquestionably claims no technical improvements. Landmark, *see, e.g.,* Dkt. No. 9, ¶ 9, focusses on two limitations from claim 1:

> . . . means for fetching additional inquiring sequences in response to a plurality of said data entered through said means for entering and in response to information received from said central processor . . . [and]

> . . . means for interactively controlling the operation of said video screen, data receiving and transmitting means; and for selectively retrieving said data from said means for storing; . . .

As explained below, once the smoke is cleared away, Landmark has plead no facts to overcome that fact that the '319 patent itself restricts these claim limitations to merely generic implementations of technology to achieve the claimed abstract idea.

### 1.  USPTO Findings Concerning Novelty And Non-Obviousness Are Irrelevant to § 101 Patent-Eligibility.

Landmark pleads the legal conclusion that claim 1 of the '319 patent recites

"inventive concepts" because the Patent Office found the above two limitations novel over prior art. Dkt. No. 9., ¶ 9. True enough, but the Court should give this finding no weight because novelty and non-obviousness are "separate inquiries" from § 101 eligibility; "the fact that a company may be the first to successfully apply an abstract idea within a new technological context does not transform the abstract idea into something tangible and patentable." *Bilski,* 561 U.S. 593 at 610-11; *Two-Way Media v. Comcast Cable Comm.,* 874 F.3d 1329, 1340 (Fed. Cir. 2017); *Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, 716 (Fed. Cir. 2014).

### 2. Even If Accepted As True, Landmark's Allegations Do Not Raise Any Genuine Factual Dispute.

Landmark alleges that the '319 patent achieves technical benefits enabling "more complex transactions, and solves the problem that these transactions "would have exhausted the data transfer capacity of conventional terminals" by reducing data congestion. Dkt. No. 9, ¶¶ 10, 11. But neither the Specification nor the claims provide even the barest hint of reducing data congestion or increasing data transfer capacity. And neither Landmark's nor its purported expert's assertions of the legal conclusion of patent-eligibility can compensate for the technical problem and solution nowhere present within the four corners of the '319 patent.

Increased data transfer capacity allegedly arises from the Direct Memory Access (DMA) 16 in the remote terminal 4, and from "two handling connections designed to prevent congestion resulting from concurrent operation of terminal

18

systems," and "to provide an interactive user interface while simultaneously fetching required data from remote sites." Dkt. No. 9, ¶ 11 and Exh. D, ¶¶ 14, 17. These alleged benefits of the DMA are irrelevant because the '319 patent nowhere suggests them, *e.g.,* using the DMA for simultaneous fetching, or to reduce data congestion, *i.e.,* the "claims do not capture what [Landmark and its] expert contends is non-routine about them." *Kaavo, Inc. v. Amazon.com, Inc.,* C.A. No. 14-353-LPS-CJB at *22 (D. Del. June 18, 2018), attached as Exh. 5. *See also Mortgage Grader, Inc., supra,* 811 F.3d at 1325-26 (ignoring expert testimony where patent was silent).

Figure 5 of the '319 patent illustrates an algorithm in which a "yes" decision in block 62 that an applicant qualifies for a loan leads to both a "NOTIFY APPLICANT" block 63, and a "NOTIFY INSTITUTION" block 65. The expert avers that this arrangement is novel because it supposedly would have resulted in a terminal performing notifications to a loan applicant and a loan institution simultaneously, not sequentially. Dkt. No. 9, Exh. D, ¶ 14. But even accepting as true that the DMA could have been used for simultaneous connections, the '319 patent discloses no "handling connections," much less simultaneous ones. The '319 patent gives no hint of simultaneity, or any order, of the notifications – which cannot be inferred or presumed. *Interactive Gift Exp., Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1342 (Fed. Cir. 2001); *Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286,

1309 (Fed. Cir. 2014) (*overruled on other grounds by Williamson v. Citrix Online, LLC, supra*).

Surely if simultaneous execution of the "notify" steps were at the core of the '319 patent's "novel technical solution," the patent would have at least mentioned it. Here is the totality of what the '319 patent has to say about executing the steps in question, including absolutely nothing about an order of execution:

> Once the terminal equipment has determined that the applicant qualifies 62 for the loan, the applicant is so notified 63, and instructed how to obtain the loan funds. The institution is also notified 65, and the loan is processed through the active case file 11 by the central processor 4.

5:36-42. Even if one assumes, in a light most favorable to Landmark, that the '319 patent could have performed "notify applicant" and "notify institution" steps simultaneously, there is nothing in the patent itself to limit the claimed "means" to such an implementation. Nowhere does the '319 patent even hint:

- that the DMA 16 is used in any special way for any notification;

- that the application and institution notifications are sequential, simultaneous, or performed in any particular order; or

- that data congestion was a problem or that any feature of the '319 patent provided improvements relating to data congestion.

In short, one might assume that the '319 patent could have improved data congestion, or sped up data communications. But even in this light most favorable

to Landmark, the '319 patent makes no mention, and certainly no claim, to these purported improvements, and therefore they cannot support patent-eligibility.

### 3. If Needed, This Court Can Accept Landmark's Claim Constructions For Purposes Of This Motion.

In cases such as this where a patent declares on its face that the basic character of its claims is an abstract idea, claim construction[6] is not needed. *See supra,* III.B.2. But if it were, Landmark has already identified claim constructions for its two purported key claims terms, "means for fetching" and "means for interactively controlling." Under 35 U.S.C. § 112, ¶ 6, these terms recite functions for which a structure must be shown in the Specification. *Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1347-49 (Fed. Cir. 2015).[7] Landmark identifies relevant portions of the Specification for both of its key claim terms. Even accepting Landmark's constructions as correct for the sake of this motion, the claims nonetheless fail to recite patent-eligible subject matter.

As discussed above Landmark purports novelty in using the DMA 16. The '319 patent discloses the DMA simply as existing third-party hardware: "[d]irect access memory modes are achieved by means of high speed data exchange units

---

[6] Claim construction is a legal determination with underlying factual questions. *Teva Pharmaceuticals USA v. Sandoz, Inc.,* 135 S. Ct. 831, 837-38 (2015).

[7] Shar reserves the right to bring a future motion on the basis that claim 1 and other claims of the '319 patent are invalid as indefinite under 35 U.S.C. § 112, ¶ 2, because, when construed according to § 112, ¶ 6, certain claim terms are lack an algorithm disclosing how the claimed function would be achieved. *Id.* at 1351-52.

such as those manufactured by Metacomp, Inc. of San Diego, Calif. and sold under the mark METAPAKS." Exh. 1, 2:38-42. The patent then describes using DMA in a conventional way:

> A modem 15 provides a two-way communication channel with the financial institution 1 and the credit rating service 3. The modem is controlled by the data processor 13 and handles a batch of information through a direct memory access [DMA] unit 16, to and from a RAM memory 17.

*Id.,* 3:39-43. The DMA 16 is mentioned just two more times. First, a terminal standby mode includes the "DMA unit 16 waiting for a transfer of information from the line into the RAM memory 17." *Id.,* 4:23-25. Second, "[o]nce the previous quotation [from the financial institution] is requested 48 the DMA unit 16 of the terminal is allowed to receive a batch of information containing the previous quotation." *Id.,* 4:63-66. In sum, all references to the DMA describe at most using off-the-shelf hardware for its intended functionality.

Further, Landmark, via its expert, says specific portions of the '319 patent correspond to the "means for fetching" and "means for interactively controlling:"

> [The means for fetching] requirement is for the terminal structures to fetch supplementary query information makes it clear that some of that data is based on data received from the central processor through the modem and DMA unit uniquely positioned together to handle information while the terminal presents video, graphic and text information via the data processor. C2:L30-66, C3:L21-27, C4:L3-14, C4:L18-26, Figure 2 & 5[.]

> [The means for interactively controlling] teaches us that instructions

> are encoded on non-transitory computer readable medium to present video, graphic and text information to a user via the data processor, based in part on information being retrieved into memory via the DMA unit uniquely positioned to handle information communication. C2:L30-66, C3:L21- 27, C4:L3-14, C4:L18-26, Figures 2 & 5[.]

Dkt. No. 9, Exh. D, ¶¶ 17(g) and (h).  But these cited passages from the '319 patent are each nothing more than an application of generic computing technology to the abstract idea of automating inquiries and answers to process a transaction.

Consider these passages: column 2, lines 30-66, simply describes generic interactions between a central processor and various remote terminals:

> The central processor 4 has a communication interface which allows it to access the various terminals 5 at the remote sites and be accessed by them at any time of the day. A communication control unit 6 associated with the central processor 4 assures an orderly sending and receiving of information between the terminals and the central processor.

Column 3, lines 21-27, describes the abstract concept of providing loan application data to a financial institution:

> [L]oan information is transmitted to the central processor of the financial institution [after it is accepted by the applicant] and stored in the active case file 11. Information about loans which have not been accepted on the spot, are also transmitted to the financial institution and stored for a period of time in the quoted case file 10. The customer can return to one of the terminals and accept that loan anytime during the validity period.

Column 4, lines 3-14, describes automating the abstract process of a loan officer initiating an inquiry with a loan applicant:

Once the system is activated 25 the recording of an image and sound of a fictitious loan officer is read from the videodisc 14 and appears on the video screen 18. The fictitious loan officer takes the applicant through a language selection routine 26-29. In this case, the applicant is asked in both English and Spanish in what language the loan transaction is to be conducted. In this phase of the operation as well as all interactive communications between the loan officer and the applicant, the loan officer explains to the applicant how to enter his answer by means of the touch pad 19.

Column 4, lines 18-26, describes the abstract process of requesting a "prior loan quotation," and then waiting for an answer:

The terminal then addresses the financial institution and requests 32 the prior loan quotation stored in the quoted case file 10 of the central processor 4. This is done by the data processor 13 of the terminal dialing the institution phone number through the modem 15 and sending a request message. The terminal goes into a standby mode with its DMA unit 16 waiting for a transfer of information from the line into the RAM memory 17.

And Figures 4 and 5, as discussed as above, show functional process flows implementing the abstract idea, not a technical architecture or solution.

In short, even accepting the constructions of "means for interactively controlling" and "means for fetching" according to Landmark's pleading, these elements are not patent-eligible inventive concepts, but rather encompass at most generic computing technology implementing parts of the abstract idea of automating inquiries and answers to process a transaction.

## V.    CONCLUSION

Because the '319 patent is invalid under 35 U.S.C. § 101 as directed to the patent-ineligible abstract idea of providing inquiries and answers to process a transaction, Landmark's counterclaims of patent infringement should be dismissed with prejudice.   Moreover, judgment of invalidity should be entered in Shar's favor.

Dated: September 18, 2018            Respectfully submitted,

                        By:  s/Charles A. Bieneman
                            Dennis J. Levasseur (P39778)
                            Michael J. Serra (P77741)
                            BODMAN PLC
                            1901 St. Antoine Street, 6th Floor
                            Detroit, MI 48226
                            (313) 393-7596
                            dlevasseur@bodmanlaw.com
                            mserra@bodmanlaw.com

                            Charles A. Bieneman (P66755)
                            BEJIN BIENEMAN PLC
                            2000 Town Center, Suite 800
                            Southfield, MI 48075
                            (313) 528-4882
                            bieneman@b2iplaw.com

                            *Attorneys for Plaintiff/Counter-Defendant*
                            *Shar Products Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 18, 2018, a true copy of the foregoing was filed electronically with the clerk of the Court using the Court's ECF system, which will send notification of such filing to all attorneys of record.

s/Charles A. Bieneman
Charles A. Bieneman (P66755)
BEJIN BIENEMAN PLC
2000 Town Center, Suite 800
Southfield, MI 48075
Ph: (313) 528-4882/Fax: (313) 528-6923
bieneman@b2iplaw.com